**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3358-19

RML CONSTRUCTION, INC.,

 Plaintiff-Respondent,

v.

GOTHAM INSURANCE
COMPANY,

 Defendant-Respondent,

and

SUBURBAN GENERAL
INSURANCE AGENCY,

 Defendant-Appellant,

and

HANG-WEI LIU, as administrator
for the estate of Jing-An Liu,
HANG-WEI LIU and GUO-ZHU
ZHANG, individually, THE CITY
OF NEW YORK, JUSTIN BERKE
and ARIES DIAZ,

 Defendants.

_____

Argued May 16, 2022 – Decided July 8, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4022-17.

Kevin M. Eppinger argued the cause for appellant (Gold, Albanese, Barletti & Locascio, LLC, attorneys; Robert Francis Gold, of counsel and on the briefs; Kevin M. Eppinger, on the briefs).

David G. Skillman argued the cause for respondent RML Construction, Inc. (Tuttle Yick, LLP, and Fuchs Rosenzweig, PLLC, attorneys; Cheryl D. Fuchs, on the brief).

John C. Gainey argued the cause for respondent Gotham Insurance Company (Kennedys CMK LLP, attorneys; Daniel Pickett, of counsel and on the brief; Margaret F. Catalano and John C. Gainey, on the brief).

PER CURIAM

In this insurance coverage dispute, defendant Suburban General Insurance Agency appeals from a September 13, 2019 Law Division order, denying reconsideration of two July 23, 2019 orders that granted summary judgment to defendant Gotham Insurance Company, and denied Suburban's cross-motion for summary judgment. Pertinent to this appeal, the motion judge concluded Gotham did not owe insurance coverage to plaintiff RML Construction, Inc. for

its involvement in a tree-removal accident that killed a cyclist in a Brooklyn park. We agree and affirm.

## I.

We summarize the pertinent facts and procedural history from the record before the motion judge. In April 2014, the City of New York awarded a $1.8 million contract to RML, a New Jersey entity, for removal of approximately 2,000 trees damaged during Superstorm Sandy. The following year, on November 16, 2015, two RML workers were cutting down a tree in Brooklyn's Coffey Park, when Jing-An Liu was struck by a falling branch or trunk while cycling. Liu later died of his injuries. In May 2016, Liu's estate filed a wrongful death action in the State of New York, Kings County, against RML, its two workers, and the City, alleging their negligence caused Liu's injuries and death.

### A. The Policy and its Procurement

At the time of Liu's accident, RML was insured by Gotham under a commercial general liability policy, effective February 24, 2015 to February 24, 2016. Suburban, a property and casualty agent and broker based in Fair Lawn, had procured the policy from Gotham on behalf of RML, its long-time client.

Suburban began representing RML in the 1990s. Beginning in 2012, Suburban placed RML's policies through Quaker Special Risk, a wholesale

insurance broker. Quaker, in turn, conducted business with Gotham, also known as ProSight Specialty Management Company. According to ProSight's president, Jacob Morin, Gotham was a "writing company," and ProSight was a "holding shell." Quaker was authorized to quote, bind, and issue policies on behalf of ProSight. Quaker also reviewed applications and wrote policies within ProSight's guidelines.

From February 2012 to February 2014, Suburban procured general liability policies for RML under ProSight's artisan trade program, which was intended for small to medium "business trade contractors." The artisan trade program provided coverage for work that fell into specific classification codes, including landscape gardening, painting, carpentry, cabinet installation, and electrical work. Pertinent to this appeal, tree pruning and tree removal were not permitted classifications under the artisan trade program.

In 2014, ProSight transitioned its artisan trade program to a specialty trade contractor program. This program was intended for building contractors whose work was more specialized than that of general contractors, and who subcontracted at least seventy percent of their work. The specialty trade program's exclusions differed in some respects from those of the artisan trade program, but neither program provided coverage for tree removal.

4

On February 19, 2014, Suburban's principal, John Arbucho, submitted an insurance application to Quaker on RML's behalf. Arbucho described the work performed by RML as: "MASONRY/CONCRETE, PAINTING, LANDSCAPING." The application stated RML's contracting operations included "PRIMARILY REPAIR AND REHABILITATION OF CONCRETE, PAINTING INCLUDES STEEL STRUCTURES, LANDSCAPE SERVICES INCLUDING PAVERS, [AND] SOME MINOR FENCE WORK POSSIBLE." The application also stated RML had a "[l]andscape [sic] contract for planting, weeding, [and] repair and replacement of power walkways."

The policy contained an unscheduled classifications exclusion which provided:

> This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of any classifications which are not scheduled in the <u>Premium</u> section of the <u>Commercial General Liability Coverage Part Supplemental Declarations</u> and for which you have not paid a premium.

The premium section stated coverage was provided only for injuries resulting from the following classifications: concrete construction, landscape gardening, "construction, reconstruction, repair or erection of building NOC," and painting

5

steel structures or bridges. Tree removal was not listed among the policy's classifications.

After the City awarded the tree removal contract to RML, Arbucho congratulated the contractor on "becoming the tree removal 'king.'" On April 25, 2014, Arbucho signed a certificate of liability insurance on behalf of Suburban, stating RML had coverage for "removal of trees damaged from [Superstorm] Sandy."

## B. Gotham's Denial of Coverage

RML submitted the estate's complaint to Gotham and requested defense and indemnification of the estate's claims in the Liu action. On January 22, 2016 and June 28, 2016, ProSight's claims specialist, Linda Dantuono, denied coverage for the accident, asserting RML was not engaged in any classification covered under the terms of the policy. Dantuono elaborated:

> Classification 97047 Landscape Gardening involves beautification work such as the design, preparation of ground, including tilling and fertilizing, planting of seeds, shrubs and small trees as well as interior landscaping. Tree care operations, however, are covered under an entirely distinct code – 99777 Tree Pruning, Dusting, Spraying, Repairing, Trimming, Fumigating. Classification 99777 involves the removal of dead, dangerous or unwanted branches, as well as chipping, removal, and clean[]up of fallen branches and other debris. It involves the use of chain saws, pruning shears, chippers and other such devices, which

6

Gotham's investigation indicates were used by RML at the [p]remises.

Thereafter, in June 2017, RML filed a complaint against Gotham in the Law Division seeking defense and indemnification in the Liu action, and against Suburban for professional malpractice.[1] Suburban filed an answer and cross-claim against Gotham for indemnification and contribution.

At deposition, Quaker's vice president, Thomas Murphy, stated when he accepted RML's application for insurance, he was not aware the company would be removing trees. According to Morin, Suburban should have known the classification for landscape gardening did not include tree removal.

When deposed, Dantuono stated that the insurance agent was responsible for explaining classification codes to the insured. According to Dantuono, a master list of classification codes is available through the Insurance Service Office (ISO).[2] Morin had provided Dantuono with an ISO form that defined

---

[1] RML's complaint also named the administrator and beneficiaries of Liu's estate, the City, and two RML employees, but the complaint asserted no claims against them, and they are not parties to this appeal.

[2] The ISO is "an organization that collects statistical data, promulgates rating information, develops standard policy forms, and files information with state regulators on behalf of insurance companies that purchase its services." Glossary: Insurance Services Office Inc. (ISO), INT'L RISK MGMT. INST., INC., https://www.irmi.com/term/insurance-definitions/insurance-services-office-inc (last visited June 23, 2022).

landscape gardening. Acknowledging she did not know exactly what was covered under the landscape gardening classification, Dantuono said she used her "general commonsense knowledge" to determine the meaning of the term. Dantuono did not believe RML had paid a premium for tree removal liability insurance because the policy did not cover that type of work.

Morin acknowledged there were multiple definitions of landscape gardening. He stated that the insured would only know the meaning of the term if the retail broker explained it. According to Morin, the specialty trade contractor program did not provide coverage for any arborist classifications. Morin asserted landscape gardening would include "light pruning of small shrubs and trees."

Arbucho stated he and RML's representative, Rochelle Cole, had discussed RML's insurance needs. He was aware RML's work involved tree removal and acknowledged Cole sent him the tree removal contract so he could find appropriate insurance. Arbucho asserted landscape gardening was broad enough to cover tree removal.

Arbucho acknowledged that in 2014 and 2015, he "missed" the fact that the policy endorsement did not include a code for tree removal. Nonetheless, Arbucho believed RML was paying a premium for tree removal work because

8

the premium was calculated based on RML's gross receipts from RML's tree removal contract, revenue that was earned by RML's removal of trees. Arbucho also acknowledged he never told Gotham RML was removing trees damaged by Superstorm Sandy. He agreed that a broker should explain to an insured the meaning of a classification code, and acknowledged Suburban's responsibility for verifying the correct classification code was included in RML's insurance policy.

The Cambridge dictionary defines landscape gardening as "the art of making gardens, parks, and areas around buildings look more natural and attractive."[3] The Merriam-Webster dictionary defines the term as "the development and decorative planting of gardens and grounds."[4] The ISO form for 97047 defines landscape gardening as "laying of top[]soil, tilling of existing soil, planting of seeds, shrubs and trees, installation of flower beds, spreading of mulch, and fertilizing."

---

[3] Landscape Gardening, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/landscape-gardening (last visited June 23, 2022).

[4] Landscape Gardener, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/landscape%20gardener (last visited June 23, 2022).

A-3358-19

Insurance classification codes for workers' compensation and employer's liability insurance are set forth in New Jersey by the Compensation Rating and Inspection Bureau (CRIB) pursuant to authorization contained in N.J.S.A. 34:15-89 and -90.1. CRIB produced the New Jersey Rate and Classification Handbook[5] and the New Jersey Workers' Compensation and Employer's Liability Manual.[6] The manual defines code number 0042, which is equivalent to ISO code 97047,[7] as "laying out of grounds, planting trees, shrubs, flowers or lawns."

The motion judge granted Gotham's summary judgment motion, rejecting Suburban's argument that the term, landscape gardening, was ambiguous. The judge found it would be "a tortured interpretation to say the removal of 2,000 tress from multiple locations under a [nearly] $2 million contract is landscape

---

[5] Rate & Classification Handbooks, NEW JERSEY COMPENSATION RATING AND INSPECTION BUREAU, https://www.njcrib.com/DocumentLibrary/RateAndClassificationHandbooks (last visited June 23, 2022).

[6] NJ Manual, NEW JERSEY COMPENSATION RATING AND INSPECTION BUREAU, https://www.njcrib.com/DocumentLibrary/NJManual (last visited June 23, 2022).

[7] General Liability Code Lookup, INS. XDATE, https://www.insurancexdate.com/gl.php?search=97047 (last visited June 23, 2022).

gardening." The judge therefore determined Gotham had no duty to defend or indemnify RML in the Liu action.[8] The judge denied Suburban's cross-motion for summary judgment and ensuing reconsideration motion on the same basis.

On appeal, Suburban primarily raises two substantive points, arguing: (1) the term, landscape gardening, was ambiguous and, as such, the ambiguity should have been resolved in favor of the insured; and (2) the two conditions set forth in the policy's unscheduled classification exclusion were not satisfied, thereby requiring Gotham to provide coverage for the Liu action. Gotham argues Suburban lacks standing to appeal, just as it argued Suburban lacked standing in the trial court to seek declarations that Gotham defend and indemnify RML in the Liu action.

## II.

As a preliminary matter, we consider Gotham's standing argument. Gotham contends Suburban lacks standing because it is neither an insured nor a beneficiary of the policy, and RML assigned no rights to it. Citing Ross v. Lowitz, 222 N.J. 494, 512 (2015), Gotham claims an entity that is "a stranger to

---

[8] The judge also determined Suburban committed professional malpractice; Suburban does not challenge that finding on appeal.

an insurance policy has no right to recover the policy proceeds." Gotham's argument is misplaced.

We review issues of standing de novo. Cherokee LCP Land, LLC v. City of Linden Planning Bd., 234 N.J. 403, 414 (2018). "Our courts have traditionally taken a generous view of standing in most contexts." In re N.J. State Cont. A71188, 422 N.J. Super. 275, 289 (App. Div. 2011). "Standing requires that a litigant have a sufficient stake and real adverseness with respect to the subject matter of the litigation, and a substantial likelihood that some harm will fall upon it in the event of an unfavorable decision." In re N.J. Bd. of Pub. Utils., 200 N.J. Super. 544, 556 (App. Div. 1985).

> Although our courts will not "function in the abstract" or entertain proceedings commenced "by plaintiffs who are 'mere intermeddlers,' . . . interlopers or strangers to the dispute," we will entertain and adjudicate suits, claims and appeals when "the litigant's concern with the subject matter evidence[s] a sufficient stake and real adverseness."
>
> [Rosenstein v. State, Dep't of Treasury, Div. of Pensions & Benefits, 438 N.J. Super. 491, 496 (App. Div. 2014) (alteration in original) (quoting Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107 (1971)).]

To have standing, "[a] party need show only a 'substantial likelihood' that he or she will experience 'some harm' in the event of an unfavorable

12

decision." Strulowitz v. Provident Life & Cas. Ins. Co., 357 N.J. Super. 454, 459 (App. Div. 2003) (quoting In re Adoption of Baby T., 160 N.J. 332, 340 (1999)). A financial interest in the outcome of the matter ordinarily is sufficient to confer standing. Courier-Post Newspaper v. Cnty. of Camden, 413 N.J. Super. 372, 381 (App. Div. 2010); see also R. 2:3-3 ("Parties interested jointly, severally or otherwise in a judgment, order, decision or action may join in an appeal therefrom or may appeal separately.").

In the present matter, the motion judge determined Suburban had standing to cross-move for summary judgment, and file its ensuing motion for reconsideration, reasoning Suburban had filed a cross-claim against Gotham for indemnification and contribution. Unlike the third-party beneficiary claim asserted by the plaintiffs in Ross, Suburban therefore had a direct claim against Gotham. See Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80 (1960) (internal quotation marks omitted) ("A person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."). Indeed, Suburban had a substantial financial stake in the matter and "real adverseness with respect to the subject matter of [RML's] litigation." See In re N.J. Bd. of Pub. Utils., 200 N.J.

13

Super. at 556.  Based on our de novo review of Gotham's lack-of-standing claim,

Cherokee LCP Land, LLC, 234 N.J. at 414, we conclude Suburban has standing

to appeal from the orders under review.

III.

We turn to the merits of Suburban's claims.  We review a court's decision

on a summary judgment motion de novo, applying the same standard as the trial

court.  Conley v. Guerrero, 228 N.J. 339, 346 (2017).  Summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact challenged and that the moving party is

entitled to a judgment or order as a matter of law."  R. 4:46-2(c); Brill v.

Guardian Life Ins. Co. of America, 142 N.J. 520, 528-29 (1995).

"The interpretation of an insurance contract is a question of law for the

court to determine, and can be resolved on summary judgment."  Adron, Inc. v.

Home Ins. Co., 292 N.J. Super. 463, 473 (App. Div. 1996); see also Celanese

Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div.

2009) (holding "unless the meaning is both unclear and dependent on conflicting

testimony[,]" the court interprets the terms of a contract as a matter of law).  In

our review, the "trial court's interpretation of the law and legal consequences

14

that flow from" it are "not entitled to any special deference." <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

Our analysis is guided by well-established principles. Courts "give special scrutiny to insurance contracts because of the stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies." <u>Zacarias v. Allstate Ins. Co.</u>, 168 N.J. 590, 594 (2001). Courts should interpret insurance policies according to "their plain, ordinary meaning." <u>Id</u>. at 595. Generally, "[a]n insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled." <u>Flomerfelt v. Cardiello</u>, 202 N.J. 432, 441 (2010).

If there are no ambiguities in the language "courts cannot 'write for the insured a better policy of insurance than the one purchased.'" <u>Ibid.</u> (quoting <u>Walker Rogge, Inc. v. Chelsea Title & Guar. Co.</u>, 116 N.J. 517, 529 (1989)). "A 'genuine ambiguity' arises only 'where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" <u>Progressive Cas. Ins. Co. v. Hurley</u>, 166 N.J. 260, 274 (2001) (quoting <u>Weedo v. Stone-E-Brick, Inc.</u>, 81 N.J. 233, 247 (1979)). "When construing an ambiguous clause in an insurance policy, courts should consider whether clearer

draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" Id. at 274 (quoting Doto v. Russo, 140 N.J. 544, 557 (1995)). N.J.S.A. 56:12-2 requires insurance policies be "simple, clear, understandable and easily readable." Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 538 (1990). Insurance contracts should avoid "confusing cross-references, excessively lengthy sentences, exceptions to exceptions, and words that are either obsolete or have a legal meaning different from their common meaning." Ibid. When an ambiguity does exist, the ambiguity is resolved against the insurer and in favor of coverage. Kopp v. Newark Ins. Co., 204 N.J. Super. 415, 420 (App. Div. 1985).

Insurance policies are "contracts of adhesion" and should be interpreted as such. Zacarias, 168 N.J. at 595. Exclusionary provisions "must be construed narrowly; the burden is on the insurer to bring the case within the exclusion." Homesite Ins. Co. v. Hindman, 413 N.J. Super. 41, 46 (App. Div. 2010). Exclusionary provisions are nonetheless "presumptively valid and will be given effect if specific, plain, clear, prominent, and not contrary to public policy." Ibid. Accordingly, courts should be careful not to disregard the clear intent of a policy's exclusion. Flomerfelt, 202 N.J. at 443. A "far-fetched" interpretation of a policy exclusion will not create an ambiguity. Flomerfelt, 202 N.J. at 442.

Suburban initially contends the term, landscape gardening as stated in the policy was ambiguous. In support of its position, Suburban asserts: Gotham drafted the policy but failed to include a definition of landscape gardening; Dantuono could not define landscape gardening; Morin could cite language in the policy defining landscape gardening; Morin testified pruning would be considered landscape gardening; and Arbucho stated the classifications were broad and meant to be inclusive and landscape gardening included tree removal. We are not convinced.

Gotham was not required to provide a definition in the policy for landscape gardening any more than it was required to provide a definition for painting steel bridges or concrete work. A commonsense interpretation of landscape gardening does not include tree removal on a massive scale. In any event, the ISO form defines the term. Dantuono's inability to precisely define landscape gardening does not mean the term was ambiguous. Both Dantuono and Morin acknowledged there was more than one definition of the term, but no definition included large-scale tree removal. The ISO form and dictionary definitions clarify the term refers to preparing soil for planting and trimming of shrubs and small trees. Conversely, landscape gardening does not pertain to the

work RML was engaged to perform under the City's contract, namely large-scale removal of damaged trees.

Moreover, Arbucho's belief that the term was broad enough to encompass tree removal is not sufficient to create an ambiguity, which "does not arise simply because the parties have offered two conflicting interpretations." Polarome Int'l, Inc. v. Greenwich Ins. Co., 404 N.J. Super. 241, 259 (App. Div. 2008). Instead, a genuine ambiguity exists only if the policy is so confusing that "'the average policyholder cannot make out the boundaries of coverage.'" Ibid. (quoting Weedo, 81 N.J. at 247). We agree with the motion judge that the average policy holder would be able to comprehend the boundaries of coverage for landscape gardening and would not consider the classification to include removal of 2,000 damaged trees. We conclude Suburban has not demonstrated the term was ambiguous.

Nor are we persuaded by Suburban's assertion of other ambiguities in the policy. For example, the term, "unscheduled classifications," – not "unscheduled classifications exclusions" – was set forth in the February 23, 2015 binder issued by Gotham. However, a binder is "interim insurance," effective from the date of the application until the policy is issued. See Shannon v. Prudential Ins. Co. of Am., 90 N.J. Super. 592, 599 (Law Div. 1966); see also 1

Robert B. Hille et al., New Appleman on Insurance Law Library Edition § 3.03 (Jeffrey E. Thomas & Francis J. Mootz III eds., 2022). Although the term, "unscheduled classifications," appears in the binder's table of contents, the policy issued two days later, on February 25, 2015, contained the language, "unscheduled classifications exclusion." The policy clearly stated there was no coverage for damages resulting from classifications not scheduled in the premium section. Thus, the binder that was replaced almost immediately with the correct language in the actual policy was not sufficient to create an ambiguity.

Suburban's remaining ambiguity claims lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). In sum, Suburban failed to demonstrate the landscape gardening classification set forth in the policy included large-scale tree removal.

We turn to Suburban's argument that the motion judge erroneously determined Gotham was not required to provide coverage for the accident because the two conditions necessary for application of the policy's unscheduled classifications exclusion were not satisfied: (1) the classification was not scheduled in the premium section; and (2) the insured had not paid a premium for the classification. Suburban claims RML paid a premium for the tree

19

removal work and, as such, the second condition was not satisfied and the exclusion should not apply. Because RML's premium was based on its gross revenues earned from tree removal, Suburban asserts RML paid an insurance premium for tree removal work.

Although a substantial portion of RML's revenue was earned from removing trees, tree removal was not a permitted classification. Quaker's auditor calculated the premium purely based on RML's gross receipts, with no consideration of the type of work performed.[9] Morin and Dantuono both stated no premium was paid for tree removal because that was not a covered classification. Moreover, Suburban never told Gotham RML was removing trees damaged during Superstorm Sandy. Because both conditions were met, Suburban failed to demonstrate RML paid a premium for tree removal work and, as such, the unscheduled classifications exclusion applied.

---

[9] In May 2016, Quaker ordered an audit of RML for the period from February 2015 to February 2016. The audit was performed by York Premium Audit Services, which determined RML owed an additional premium of $20,441. York considered RML's revenue but did not review its contracts. RML did not pay the additional premium.

In view of our disposition, we decline to consider RML's argument that Gotham should pay the settlement in the underlying Liu action, and RML's counsel fees in the Liu action and on appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3358-19